UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

EASTMAN KODAK COMPANY,


                              Plaintiff,

                                             DECISION AND ORDER
                                             GRANTING PRELIMINARY
                                                 INJUNCTION

                                             11-CV-6513L


                v.

COLLINS INK CORPORATION,


                              Defendant.
_____

        For over a decade, Collins Ink Corporation ("Collins"), had a contract with Eastman Kodak

Company ("Kodak") to supply ink for use in Kodak's commercial ink-jet printers, including the

Versamark line of printers.  The most recent three-year Agreement, effective December 15, 2008,

was in effect when Collins' President, Lawrence Gamblin, wrote to Kodak personnel on October 10,

2011 (Ex. C to Declaration of Douglas S. Tinnel [Dkt. #3-3]) (sometimes "Gamblin letter") advising

Kodak that Collins was terminating the Agreement "effective immediately."  The Gamblin letter was

startling and unexpected and galvanized Kodak to action.

        Within days, Kodak filed a complaint (Dkt. #1) in this case alleging breach of contract and

seeks various forms of relief.   In addition, Kodak moved immediately, with supporting

documentation (Dkt. #3) for a preliminary injunction to compel Collins to comply with its

contractual obligations under the Agreement and to desist acting contrary to that Agreement.

        The Court conferred with counsel within days by telephone and established a schedule for

briefing and argument of Kodak's motion for a preliminary injunction.  Responding papers were

filed (Dkt. ##10, 11), but when the parties appeared for argument on October 24, 2011, they

announced that they had reached an agreement to keep the contract in place and maintain the *status quo* for at least a week for the purpose of discussing possible resolution.

The parties were unable to consummate an agreeable resolution and additional papers were filed and the parties appeared and argued their respective positions at length before this Court on November 1, 2011.  At that time, the parties agreed to maintain the *status quo* pending the decision of this Court and the matter was taken under advisement.

After reviewing the complaint, the declarations and exhibits submitted on the motion for a preliminary injunction, and having considered the comments of counsel, I believe that Kodak has established its entitlement to a preliminary injunction, enjoining Collins from taking steps to terminate the Agreement and compelling Collins to fully comply with that Agreement and all of its terms.

## FACTS

Relevant matters surrounding this dispute occurred within a relatively brief period of time and are not in dispute.[1]  There is no dispute that the Agreement between Kodak and Collins (Dkt. #3-4 at 1) was executed and became effective in December 2008.  The Agreement was for a three-year term but also contained an automatic renewal provision at Section 10.01 of the Agreement.  That provision, which is at the heart of this dispute, reads in full as follows:

> 10.01   Term and Renewal.   The initial term of this Agreement shall be for a period of three (3) years commencing on the Effective Date hereof, and shall automatically renew annually thereafter.  Either party may terminate this Agreement for any reason with one hundred and eighty (180) days written notice.

It appears that there were three or four prior contracts between the parties over the past decade.  There apparently were negotiations relative to each new Agreement with some modest changes made over the course of time.  The parties had never relied on the automatic renewal

---

[1] Neither side sought a factual hearing and one does not seem to be required based on the uncontested facts.

provision but had always crafted a new agreement prior to the expiration of the former one.

It appears that during the Spring and Summer of 2011, Gamblin and representatives of Kodak had exchanged correspondence and even a draft, proposed new agreement relative to their business operations.  But, no new agreement was ever agreed to or executed prior to Gamblin's letter of October 10, 2011.  That letter, purporting to immediately terminate the existing Agreement is the spark that occasioned the conflagration that is the pending litigation and Kodak's motion for injunctive relief.

Gamblin's letter of October 10, 2011, is crucial to the issues before this Court, both for what it says and for what it fails to say.  The letter purports to terminate the Agreement but makes no reference whatsoever to the very specific termination provisions contained in the Agreement at Section 10.02.  That section could not be clearer, and I set it forth here in full:

> 10.02   Termination for Cause.  Either party may terminate this Agreement upon written notice of termination to the other party for any of the events given in sub-paragraphs (a) and (b).
>
> a. The other party materially breaches this Agreement and such breach remains uncured for thirty (30) days following written notice of breach by the terminating party.
>
> b.   A petition for relief under any bankruptcy legislation is filed by or against the other party, or other party makes an assignment for the benefit of creditors, or a receiver is appointed for all or a substantial part of the other party's assets, and such petition, assignment or appointment is not dismissed or vacated within thirty (30) days.

The Gamblin letter, as mentioned, makes no reference to any of those provisions.  Rather, the October 10, 2011 termination letter sets forth Gamblin's concern with Kodak's present financial circumstances and references "recent news reports."  He also states his belief that there is a "significant probability" that Kodak could default on its financial obligations at some future time.

Because of that anxiety, Gamblin unilaterally purported to terminate the Agreement by immediately ceasing shipments of ink unless and until Kodak agreed to pay for such shipments on

a cash on delivery basis ("COD").  That decision relative to new payment requirements was contrary to the payment requirement set forth in the Agreement (Section 2.08) which provided that "except where otherwise mutually agreed" payment terms would be net sixty (60) days, that is, Kodak would make payment sixty (60) days after receipt of an invoice from Collins.

There apparently is no dispute that Kodak was and is now current on all of its financial obligations to Collins.  It is true that because of the volume of ink supplied by Collins pursuant to the Agreement, the accounts receivable could exceed two million dollars on prior invoices at a given time.  There is no evidence, however, that Kodak neglected or refused to pay any invoices and Gamblin's letter of October 10 did not base the termination decision on Kodak's defalcation on any payment that was due.

It appears that even prior to Gamblin's letter, Collins had stopped production for Kodak and within days orders for ink in the amount of $250,000 were not filled.[2] Declaration of Douglas Tinnel, October 17, 2011 Declaration, ¶ 28 (hereinafter "Tinnel October 17, 2011 Decl.").

The Agreement provided many specific rights to Kodak and obligations on Collins relating to Collins' agreement to provide Kodak with ink for its printers.  Kodak was dependent on Collins' compliance and Collins unilateral and unexpected termination had a significant impact on Kodak.

The Agreement provided exclusive rights to Kodak.  Specifically, Section 2.01 gave Kodak the "exclusive right to sell and distribute Collins' inks worldwide for use in Kodak Print Engines. Collins also agreed not to sell inks used in categories of Kodak printers, if Kodak elected to sell ink products for that type of printer.

An important provision of the Agreement was that Collins would maintain a sufficient inventory of ink in order to fill Kodak orders on only two days notice.  Section 2.04.  Kodak kept

---

[2]During the process of this litigation, Collins, through counsel, represented on two occasions, on October 24, 2011 and November 1, 2011, that as a temporary accommodation, Collins would now continue to fill Kodak's orders pending this Court's ruling on the pending motion.

no significant inventory and relied on Collins.  Kodak, and only Kodak, could discuss and set prices for its printing customers; Collins had no right to do so.  Section 2.06.

In consideration of Collins' obligations, Kodak agreed that Collins alone would provide up to 88% of the ink volume needed by Kodak for its printers.  Section 1.05.  Pricing between the parties would be reviewed every six months but any changes in the pricing structure had to be based on a mutual agreement.  Section 1.06.

As required by the Agreement, Kodak transferred technical and chemical information in its possession to Collins for it to prepare ink to Kodak's specifications.  This information also included confidential computer technology.  Kodak treats all such information as proprietary trade secrets that Collins is only authorized to use in connection with the Agreement.  Declaration of Larry Calhoun, October 17, 2011, ¶ 3 (Dkt. #3-2).

This Agreement is significant to Kodak but also to Collins since it generated approximately 15 million dollars a year in revenue to Collins.  Tinnel, October 17, 2011 Decl., ¶ 8.  (Dkt. #3-3).

Because Kodak kept no appreciable inventory and because Collins had the right to produce 88% of Kodak's ink supply, the Agreement "envisioned a steady flow of ink to Kodak."  Tinnel October 17, 2011 Decl., ¶ 9.  Maintaining a ready supply was crucial because Kodak submitted orders to Collins on almost a daily basis.   Tinnel, October 17, 2011 Declaration, ¶ 18.

## CONTENTIONS OF THE PARTIES

Kodak claims that this is a straight-forward breach of contract case and that it is entitled to injunctive relief because Collins supplies a unique product to Kodak; that the abrupt termination of this product jeopardizes Kodak's business and its ability to service existing clients and impairs its goodwill with such customers.  Kodak also maintains that  Collins publicly announced on its own website that Kodak customers should no longer work with Kodak but deal directly with Collins.

Kodak maintains that this is a blatant breach of the Agreement which provides that Kodak has the exclusive right, worldwide, to distribute Collins' ink products.

Furthermore, Kodak contends that Collins failed to comply in any way with the very specific termination provisions contained in the Agreement and that unless and until that occurs, Collins should be compelled to live up to its negotiated contractual obligations.

Collins does not seek to justify its action under the terms of the contract.  Rather, it claims that it had legitimate concerns over Kodak's financial status and it was entitled to obtain reasonable assurances of Kodak's performance and that it acted consistent with Section 2-609 of the Uniform Commercial Code.  Collins also contends that the Agreement, executed in December of 2008, terminates on its own accord in December 2011, some few weeks away.  Collins contends that in spite of the automatic renewal provision in the agreement, the parties had always negotiated a new agreement and that should control.

Kodak contends, to the contrary, that the Agreement does not terminate at the end of the three-year term but renews automatically unless and until a party properly terminates consistent with the termination provisions of the Agreement.  Kodak contends that a fair reading of the Agreement clearly establishes that the parties never intended that there would be abrupt unilateral cessation of business.  It was important for the parties, and especially for Kodak, that there be a continuation of business and a ready supply of product and the termination provisions and the entire Agreement reflect that.

## STANDARDS FOR DETERMINATING ENTITLEMENT
## TO A PRELIMINARY INJUNCTION

To prevail on a motion for a preliminary injunction, the movant must demonstrate "'(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships

tipping decidedly toward the party requesting the preliminary relief.'" *Citi group Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).  *Accord UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.*, ___ F.3d ___, 2011 WL 4389991, at *4 (2d Cir. 2011).  The court must also take into account the public's interest, if any, in the issuance or denial of an injunction.  *Red Earth LLC v. United States*, ___ F.3d ___, 2011 WL 4359919, at *2 (2d Cir. 2011) (citing *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)).

With respect to the issue of irreparable harm, the Second Circuit has found irreparable harm where one party is "terminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product," since the termination of such a product "almost inevitably creates irreparable damage to the good will of the distributor." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908-09 (2d Cir. 1990).  District courts in this circuit have continued to adhere to that principle, and to find irreparable harm in such circumstances. *See*, *e.g.*, *Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc.*, 754 F.Supp.2d 616, 622 (S.D.N.Y. 2010) ("While it may be true that Rex will eventually find an alternative distributor, ... completely halting the sale of [the product at issue] will harm Rex's reputation and goodwill in ways that cannot be valued"); *TVT Records v. Island Def Jam Music*, 225 F.Supp.2d 398, 405 (S.D.N.Y. 2002) ("[t]he Court ... finds considerable risk that TVT's business relationships ... will be irreparably harmed if TVT is improperly prevented from ever bringing this unique product to market").

### APPLICATION TO THIS CASE

Applying these standards here, I conclude that preliminary injunctive relief is warranted.  The facts before me indicate that Collins's termination of the contract was improper, under the terms of the contract itself, and that Kodak is therefore likely to prevail on the merits of its claims.  The

record also suggests that Kodak is threatened with the termination of a product that, if not literally unique, cannot easily or quickly be replaced, and that as a result, Kodak is threatened with an irreparable loss of customer goodwill.

First, it seems apparent that Collins has not complied with the termination procedures under the contract. The current contract, which became effective on December 15, 2008, *see* Dkt. #3-4 at 1, provides that it will be effective for three years from that date, and that it will automatically renew annually thereafter, unless it is terminated by either party. *See* Dkt. #3-4 at 10 § 10.01.

Under the contract, however, neither party may simply terminate immediately, as Collins has attempted to do here. Specific procedures are provided governing termination. If the termination is for cause, that is, based upon the other party's breach or bankruptcy, the terminating party must give the other party thirty days' notice. *Id.* § 10.02. There does not appear to be any claim here by Collins, and there is no evidence before me, that Collins has "cause" for termination under this provision.

If the termination is not for cause, then the terminating party must give the other party 180 days' written notice. *Id.* § 10.01. Collins plainly did not give such notice here. It simply informed Kodak on October 10, 2011 that it was "terminating the Supply & Reseller Agreement dated December 15, 2008 effective immediately." Dkt. #3-6 at 1. Gamblin's letter did not even purport to effect a termination pursuant to the procedures set forth in the parties' contract.

At oral argument on Kodak's motion for a preliminary injunction, counsel for Collins contended that Kodak's "theory as to the 180 day [notice of termination] provision renders the whole contract nonsensical ... because [under that theory] if you don't give notice of non-renewal by July 1st, you're now saddled with not a 12 month agreement, but with an 18 month agreement." Dkt. #20 at 8. That argument is not persuasive. The contract simply provides that either party may terminate on 180 days' notice, and that if neither party terminates within 180 days prior to December 15, 2011, the contract will automatically renew for a twelve-month term, subject, again, to the 180-day

termination provision.  So for example, if one party had given the other notice of termination on October 11, 2011, the contract would renew on December 15, 2011, but terminate 180 days later, on March 29, 2012.  That is hardly a "nonsensical" reading of the contract.

Defendant's insistence that "the contract expires by its terms on December 15th," *id.* at 20, is also contrary to the express terms of the Agreement.  The contract manifestly provides that it "shall automatically *renew*," not terminate, absent termination by either party under the notice procedures set forth in the contract–procedures that were not followed here.

Collins has also argued that it was entitled to insist on adequate assurance of Kodak's performance under the contract pursuant to § 2-609 of the Uniform Commercial Code.  This argument requires scant discussion.

Section § 2-609(1) provides that "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party [to a contract for sale] the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return."  In addition, "[a]fter receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."  N.Y. U.C.C. § 2-609(4).

That statute further provides that "[b]etween merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards." N.Y. U.C.C. § 2-609(2).  The statute does not state that one party may take it upon itself, based purely upon its subjective doubts or feelings of nervousness about whether the other party will be able to perform, to insist upon such assurances.  Nor does this provision state that a party may unilaterally rewrite the terms of a sales contract to insist upon C.O.D. payments, as Collins attempted to do here, *see* Dkt. #3-6 at 1, or that a party may simply announce, as Collins has, that it "do[es] not see at this time how [the other party] can adequately assure its performance of the contract ... ."  *Id.*

Like the contract itself, the U.C.C. sets forth certain requirements that must be adhered to, including thirty days' notice based upon a "justified demand" for adequate assurances of performance, none of which occurred here.

There hardly seems room for question, then, that Collins's purported termination of the contract was improper, and was in breach of the contract. I therefore conclude that Kodak has shown a likelihood of success on the merits.

As to irreparable harm, I also find that while the ink that is the subject of this contract may not be unique in the sense that a work of art is unique, *see, e.g.*, *Robins v. Zwirner*, 713 F.Supp.2d 367, 374 (S.D.N.Y. 2010), the record before me indicates that this product is not easily replaceable. The parties dispute how easily or quickly Kodak can meet its needs by manufacturing this type of ink, but the evidence does suggest that Kodak cannot, at this time, manufacture 100% of the ink that it could expect to receive under the contract. Even Collins recognizes this. *See* Collins's Mem. of Law (Dkt. #11) at 18 ("Kodak is already manufacturing the *majority* of the ink to meet its customers' needs") (emphasis added); Transcript of Oral Argument (Dkt. #20) at 30 (defense counsel's statement that "[t]here may be smaller volumes, smaller specialty items that they're [*i.e.*, Kodak] going to have problems ramping up on ...").

In addition, there is evidence that some of that ink is needed by end users for very specific purposes, such as printing lottery tickets, and that such ink cannot easily be replaced by Kodak, which, in reliance on Collins's commitment to provide it with a steady supply of ink, has not amassed or maintained any stockpile of ink. *See* Tinnel Declaration (Dkt. #3-3) ¶¶ 51, 54. An inability on Kodak's part to provide such ink to its customers therefore threatens to cost it customer goodwill, the loss of which cannot easily be quantified or reduced to a dollar amount. *See CRP/Extell Parcel I, L.P. v. Cuomo*, 394 Fed.Appx. 779, 781 (2d Cir. 2010) ("we have upheld an award of injunctive relief where a movant claimed money damages that were hard to measure plus irreparable harm, including loss of reputation, goodwill and business opportunities") (citing

- 10 -

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)) (emphasis omitted); *Coastal Distribution, LLC v. Town of Babylon*, No. 05 CV 2032 2006 WL 270252, at *3 (E.D.N.Y. Jan. 31, 2006) ("Loss of goodwill and injury to reputation are injuries that are difficult to measure in dollars, and thus, these types of injuries are irreparable harm").

There is also evidence that Collins has solicited Kodak's customers.  Kodak has submitted an image of a page from Collins's website, announcing Collins's termination of its contract with Kodak, and stating, *inter alia*, that "[i]f you are currently purchasing Collins Ink branded products, you will now purchase them directly from Collins" instead of from Kodak.  The announcement goes on to say that "you will now find that the prices you pay us will tend to be lower than what you paid Kodak for our inks," and that "[i]f you are currently purchasing Kodak branded fluids, please feel free to contact us, as we can provide you with a list of comparable Collins branded products."  Dkt. #3-7 at 1.  Although Collins's attorney stated at oral argument that "Mr. Gamblin was instructed to take that stuff down," and that Gamblin had assured his attorney "that he is not soliciting Kodak's business at this point in time," Dkt. #20 at 32, that announcement may already have caused some irreparable, unquantifiable harm to Kodak.  An injunction that will allow Kodak to continue to service its Collins ink customers will at least mitigate that harm.  *See Kishner v. Nevada Standing Committee on Judicial Ethics and Election Practices*, No. 10-CV-01858, 2010 WL 4365951, at *7 (D.Nev. Oct. 28, 2010) ("Although an order attempting to 'unring the bell' [with respect to disseminated information] may not completely alleviate the injury, it will minimize further injury to the extent possible").[3]

A contract is a contract.  From it flow rights and obligations.  Anxiety, nervousness, or "buyer's remorse" about the wisdom of the contract does not absolve one from complying with all

---

[3]  As of now, those statements on Collins's website can still be seen on Google's cache of that site, which displays the page as it appeared on October 12, 2011.
*See* http://webcache.googleusercontent.com/search?q=cache:iUL6nL-gj5sJ:www.collinsink.com/m-3-kodak.aspx+&cd=1&hl=en&ct=clnk&gl=us.

of the terms of that contract. Unilateral action is abhorrent to the very nature of a mutual, binding commercial agreement.

## WHETHER A BOND IS NECESSARY

Rule 65(c) of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." This provision "serves a number of functions. It assures the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff. In addition, the bond provides the plaintiff with notice of the maximum extent of its potential liability." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011).

Although the rule is couched in mandatory language, the Second Circuit has held that "the District Court is vested with wide discretion in the matter of security," and that it may be "proper for the court to require no bond where there has been no proof of likelihood of harm." *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996); *accord Corning Inc. v. PicVue Electronics, Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004); *see also Johnson Controls, Inc. v. A.P.T. Critical Systems*, 323 F.Supp.2d 525, 541 (S.D.N.Y. 2004) ("in cases where the non-movant has not shown a likelihood of harm, the district court may properly set no bond"). District courts in this circuit have declined to require any bond where there was no showing of a likelihood of harm to the enjoined party. *See*, *e.g.*, *City of New York v. Venkataram*, No. 06 Civ. 6578, 2011 WL 2899092, at *6 n.9 (S.D.N.Y. July 13, 2011); *ASA v. Pictometry Intern. Corp.*, 757 F.Supp.2d 238, 247 (W.D.N.Y. 2010); *Lurgi, Inc. v. Northeast Biofuels, LP*, No. 09-MC-0024, 2009 WL 910042, at *7 n.10 (N.D.N.Y. Apr. 2, 2009).

With respect to the issuance of a bond in this case, it bears repeating that the primary purpose of a bond is to make the enjoined party whole in the event that it is later determined that the injunction was wrongfully issued. *See* Fed. R. Civ. P. 65(c). In the context of the case at bar, then, the relevant harm to Collins is not the harm that would ensue if Collins's fears about Kodak's financial situation prove well-founded, and Kodak becomes unable to pay its bills, but the harm that Collins would suffer by being wrongfully enjoined.

In that regard, it makes sense to consider the likelihood that this Court or an appellate court will find that an injunction should not have issued in this case. The greater plaintiff's likelihood of success on the merits, the lower the probability that an injunction in plaintiff's favor will later be determined to have been issued in error, and consequently that Collins will be found to have wrongfully suffered harm. *See, e.g.*, *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 345 (S.D.N.Y. 2010) ("Defendant has not demonstrated it will likely suffer any harm absent the posting of a bond, and the likelihood of success on the merits is overwhelming. Therefore, the Court declines to require one"); *Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc.*, 754 F.Supp.2d 616, 627 (S.D.N.Y. 2010) ("I have already concluded that Angiotech is highly unlikely to prevail in arbitration; that militates against the posting of *any* bond"). As explained above, I find it very likely that Kodak will prevail on the merits of its claims, since the evidence before me plainly indicates that Collins simply flouted the terms of the contract when it unilaterally terminated the contract without the requisite notice.

I also see no proof of any likelihood of harm to Collins. All that this injunction does is require Collins to continue to perform under the contract, as it has been doing for years. That hardly constitutes a cognizable "harm" to Collins. *See ASA*, 757 F.Supp.2d at 247 (declining to require a bond, and stating that "[s]ince the injunction does no more than preserve the preexisting status quo, in which the parties were engaged in an ongoing contractual relationship (which presumably was mutually beneficial to them), there is little risk of significant harm to either side"); *Rex Medical*, 754

- 13 -

F.Supp.2d at 627 ("if the arbitrator rules as this Court believes he will rule, then the 'damage' to [the enjoined party] is nonexistent, because being forced to comply with contractual obligations that a party voluntarily entered into is simply not the sort of 'damage' that is compensable at law").

I recognize Collins's fear that Kodak may become insolvent, and that Collins will be left with significant accounts receivable. Any such risk, though, in itself, does not justify the imposition of a bond requirement here. If such an event does come to pass, then Collins will have the same remedies as any other unsecured creditor of Kodak. It may not, however, seek to jump to the head of the line by refusing to perform its own obligations under the contract unless Kodak accedes to its demands to be paid on delivery. To require a bond under these circumstances would only reward Collins for its own apparent breach of the parties' contract, by giving it the very protection that it sought to wring out of Kodak.

## CONCLUSION

Plaintiff Eastman Kodak Company's motion for a preliminary injunction (Dkt. #3) is granted. Defendant Collins Ink Corporation is hereby preliminarily enjoined from (1) dishonoring its contractual obligations and commitments under the parties' Supply & Reseller Agreement entered into on December 15, 2008, and (2) terminating that contract, other than in accordance with the termination provisions set forth in Part X (10) of the agreement.

The parties are hereby directed to confer with each other concerning the need for discovery, if any, and to contact the Court within fourteen (14) days of the date of entry of this Decision and Order to set up a schedule for discovery and for a hearing relative to the issuance of a permanent injunction.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       November 4, 2011.

- 14 -